Woodcock v. Cumberland Cnty. Hosp. Sys., Inc., 2022 NCBC 68.

STATE OF NORTH CAROLINA
GUILFORD COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 5216

MICHAEL G. WOODCOCK,
Individually and Derivatively on
behalf of Fayetteville Ambulatory
Surgery Center Limited Partnership,

Plaintiff,

v.

CUMBERLAND COUNTY
HOSPITAL SYSTEM, INC.; CAPE
FEAR VALLEY AMBULATORY
SURGERY CENTER, LLC;
SURGICAL CARE AFFILIATES,
LLC; and NATIONAL SURGERY
CENTERS, LLC,

Defendants,

and

FAYETTEVILLE AMBULATORY
SURGERY CENTER LIMITED
PARTNERSHIP,

Nominal
Defendant.

**ORDER AND OPINION ON
DEFENDANTS' MOTIONS FOR
PARTIAL JUDGMENT ON THE
PLEADINGS
[PUBLIC][1]**

**THIS MATTER** is before the Court on two separate Motions ("Motions," ECF Nos. 79, 89). First, Defendants Cumberland County Hospital System, Inc. ("CCHS") and Cape Fear Valley Ambulatory Surgery Center, LLC ("CFVASC") jointly filed a Motion for Partial Judgment on the Pleadings on 21 June 2022. (ECF No. 79.) Second, Surgical Care Affiliates, LLC ("SCA") and National Surgery Centers, LLC

---

[1] Recognizing that this Order and Opinion cites and discusses the subject matter of documents that the Court has allowed to remain filed under seal in this action, the Court elected to file this Order and Opinion under seal on 3 November 2022. The Court then permitted the parties an opportunity to propose redactions to the public version of this document. The parties did not propose any redactions. Accordingly, the Court now files the unredacted, public version of this Order and Opinion.

("NSC") also jointly filed a Motion for Partial Judgment on the Pleadings on 11 July 2022. (ECF No. 89.)

THE COURT, having considered the Motions, the briefs of the parties, the arguments of counsel, the applicable law, and all appropriate matters of record, **CONCLUDES** that the Motions should be **GRANTED**, in part, and **DENIED,** in part, for the reasons set forth below.

*Douglas S. Harris for Plaintiff Michael G. Woodcock.*

*K&L Gates LLP by Marla T. Reschly, Susan K. Hackney, and Daniel D. McClurg for Defendants Cumberland County Hospital System, Inc. and Cape Fear Valley Ambulatory Surgery Center, LLC.*

*Bradley Arant Boult Cummings LLP by Jonathan E. Schulz and Christopher C. Lam for Defendants Surgical Care Affiliates, LLC and National Surgery Centers, LLC.*

Davis, Judge.

## INTRODUCTION

1. This action relates to the ownership and operation of Fayetteville Ambulatory Surgery Center Limited Partnership ("FASC"), which operates an ambulatory surgery center in Fayetteville, North Carolina. (Compl. Ex. 1, at pp. 6–7, ECF No. 3.2.)

2. As discussed in more detail below, the key issue in this case stems from the parties' disagreement over the validity of a 1 April 2019 sale by NSC of its 100% equity ownership interest in CFVASC (the general partner of FASC) to CCHS (a former limited partner of FASC). (Compl. ¶ 17, ECF No. 3 (sealed), ECF No. 15.)[2]

---

[2] In this opinion, this sale is referred to as the "April 2019 Transaction."

3. Although discovery in this case has been ongoing for quite some time, the Motions presently before the Court—as set out above—are motions for partial judgment on the pleadings pursuant to Rule 12(c) of the North Carolina Rules of Civil Procedure.

## FACTUAL AND PROCEDURAL BACKGROUND

4. "The Court does not make findings of fact on a Rule 12(c) motion for judgment on the pleadings." *Blusky Restoration Contrs., LLC v. Brown*, 2022 NCBC LEXIS 124, at *4 (N.C. Super. Ct. Oct. 20, 2022). Rather, the Court recites only those allegations in the pleadings and matters of record that are relevant and necessary to the Court's determination of the Motions.

5. Although the limited partnership agreement controlling FASC has been amended several times, the version of the agreement relevant to this dispute is dated 1 October 1995 and entitled "Second Amended and Restated Limited Partnership Agreement." (Compl. Ex. 1 [hereinafter "1995 LP Agreement"].)

6. At the time the 1995 LP Agreement was executed, FASC was comprised of CFVASC—then known by its former name of NSC Fayetteville, Inc. ("NSC Fayetteville")—as the general partner along with twelve limited partners. (1995 LP Agreement, at Sched. A.) NSC Fayetteville was a wholly owned subsidiary of NSC, which, in turn, was a wholly owned subsidiary of SCA. (Compl. Ex. 3, ECF No. 3.4; Compl. Ex. 4 [hereinafter "Equity Purchase Agreement"], at p. 1, ECF No. 3.5

(sealed).) Among the twelve limited partners were Plaintiff Michael Woodcock and CCHS.[3] (1995 LP Agreement, at Sched. A.)

7. At some point in time, NSC and SCA made known their intent to sell the equity in NSC Fayetteville. (Compl. Ex. 5 [hereinafter "Contribution Agreement"], at p. 1, ECF No. 3.6 (sealed).) Woodcock and CCHS separately engaged in negotiations with NSC and SCA in an effort to acquire NSC Fayetteville. (Compl. Ex. 2, ECF No. 3.3; Compl. Ex. 6, ECF No. 3.7.) NSC and SCA ultimately decided to sell the equity in NSC Fayetteville to CCHS, precipitating the April 2019 Transaction. (Equity Purchase Agreement, at p. 1.)

8. The April 2019 Transaction actually comprises two distinct, but related, agreements that were both entered into on 1 April 2019. First, CCHS conveyed all of its then-owned limited partner shares to NSC Fayetteville by means of a written agreement titled "Contribution Agreement" (Compl. Ex. 5, ECF No. 3.6 (sealed)), which purported to divest CCHS of its limited partner status in FASC. (Compl. ¶ 17.) NSC Fayetteville, CCHS, and NSC were the signatories on the Contribution Agreement. (Contribution Agreement, at pp. 4–6.)

9. By virtue of the Contribution Agreement, NSC Fayetteville was to remain the owner of the limited partner shares it already held and to also become the owner of the limited partner shares that it was receiving from CCHS. In addition, the Contribution Agreement stated as follows:

---

[3] Woodcock is a medical doctor in Cumberland County, North Carolina. (1995 LP Agreement, at Sched. A.) CCHS is a North Carolina non-profit corporation that has surgical centers and operating rooms also located in Cumberland County. (Compl. ¶ 3.)

Immediately following the consummation of the Conveyance in accordance with the terms and conditions contained herein, [CCHS] has agreed to purchase from [NSC], and [NSC] has agreed to sell to [CCHS], all of the [NSC Fayetteville] Equity owned by [NSC] for the consideration and on the terms and subject to the conditions set forth in that certain Equity Purchase Agreement, by and among the Parties, dated as of the Effective Date (the "Purchase Agreement"). Immediately following the Conveyance and the consummation of the transactions contemplated by the Purchase Agreement, [CCHS] will (a) directly own all of the [NSC Fayetteville] Equity and (b) indirectly, through its ownership of the [NSC Fayetteville] Equity, own (i) all of the General Partner Units of FASC and (ii) 56.09986239 Limited Partner Units of FASC.

(Contribution Agreement, at p. 1.)

10. Immediately thereafter, a second document, the "Equity Purchase Agreement," was executed. (Compl. Ex. 4, ECF No. 3.5 (sealed).) The signatories on the Equity Purchase Agreement were, once again, NSC Fayetteville, CCHS, and NSC. (Equity Purchase Agreement, at pp. 26–28.)

11. The Equity Purchase Agreement stated that CCHS was purchasing from NSC 100% of the equity of NSC Fayetteville. (Equity Purchase Agreement, at p. 1.) The agreement further provided that CCHS would "(a) directly own one hundred percent (100%) of the Equity of [NSC Fayetteville] and (b) indirectly, through its ownership of [NSC Fayetteville], own (i) one hundred percent (100%) of the 'General Partner Units' of FASC and (ii) 43.6574805% of the 'Limited Partner Units' of FASC[.]" (Equity Purchase Agreement, at p. 1.)

12. On 17 April 2022, NSC Fayetteville was renamed CFVASC.

13. In this lawsuit, Woodcock challenges the validity of the April 2019 Transaction and argues that CCHS "does not have lawful authority to own 100% of [CFVASC] or to exercise any authority over [CFVASC]." (Compl. ¶ 146.)

14.     Essentially, Woodcock contends that the April 2019 Transaction breaches various provisions of the 1995 LP Agreement and that the methods utilized to effectuate the transaction were purposefully crafted to sidestep certain terms contained within the 1995 LP Agreement.  (Compl. ¶¶ 18–29.)

15.     The same factual background underlying this lawsuit was the subject of a prior lawsuit filed by Woodcock (along with several of the other limited partners of FASC) against CCHS and CFVASC.  *See Woodcock v. Cumberland Cty. Hosp. Sys., Inc.*, Case No. 2019-CVS-8790 (Guilford Cty. N.C. Super. Ct.) (the "Prior Lawsuit"). The Prior Lawsuit was voluntarily dismissed without prejudice by Plaintiffs pursuant to Rule 41 of the North Carolina Rules of Civil Procedure on 24 November 2020.  (*Id.*, Pls.' Voluntary Dismissal Without Prejudice Pursuant to Rule 41(a)(1), ECF No. 85.)

16.     On 11 May 2021, Woodcock, Carol Wadon, Camille Wahbeh, and George Demetri (all limited partners of FASC) filed the Complaint in the present action against CCHS, CFVASC, SCA, and NSC.[4]  The Complaint asserted a combination of claims brought both individually and derivatively on behalf of FASC.  (Compl. ¶¶ 12–146.)[5]

17.     After an initial stay of this action, (ECF No. 42), each of the named Defendants filed an answer to the Complaint on 23 September 2021.  (ECF Nos. 45–46.)

---

[4] FASC was named as a nominal Defendant.

[5] On 19 September 2022, Plaintiffs Wadon, Wahbeh, and Demetri voluntarily dismissed all of their claims, leaving Woodcock as the sole remaining Plaintiff in this action.  (ECF No. 108.)

18. Woodcock filed a Motion for Declaratory Judgment on 8 November 2021 (ECF No. 49), which was subsequently denied without prejudice by the Court on 20 January 2022. (ECF No. 75.)

19. On 21 June 2022, CCHS and CFVASC filed a Motion for Partial Judgment on the Pleadings, seeking the dismissal of all of Woodcock's individual claims against them as well as dismissal of the fourth claim for relief in the Complaint, which purported to assert an alternative derivative claim for breach of contract against CFVASC. (Defs. CCHS, Inc. and CFVASC, LLC's Mot. Partial J. Pleadings, ECF No. 79.) In support of their Motion, CCHS and CFVASC attached the Contribution Agreement and the Equity Purchase Agreement. (*See* Defs. CCHS, Inc., and CFVASC, LLC's Br. Supp. of Mot. Partial J. Pleadings [hereinafter "CCHS & CFVASC Br. Supp."], ECF No. 80; CCHS & CFVASC Br. Supp. Ex. A, ECF No. 81.1; CCHS & CFVASC Br. Supp. Ex. B, ECF No. 81.2.)

20. Subsequently, on 11 July 2022, Defendants SCA and NSC filed a separate Motion for Partial Judgment on the Pleadings, seeking dismissal of the individual claims asserted against them as well as of Woodcock's standalone claim for punitive damages designated as the sixth claim for relief in the Complaint. (Defs. SCA, LLC's and NSC, LLC's Mot. Partial J. Pleadings, ECF No. 89.)

21. On 6 October 2022, the Court held a hearing on the Motions, which are now ripe for resolution.

**LEGAL STANDARD**

22. Rule 12(c) is intended "to dispose of baseless claims or defenses when the formal pleadings reveal their lack of merit and is appropriately employed where

all the material allegations of fact are admitted in the pleadings and only questions of law remain." *Dicesare v. Charlotte-Mecklenburg Hosp. Auth.*, 376 N.C. 63, 70 (2020) (cleaned up). In deciding a Rule 12(c) motion, "the trial court is required to view the facts and permissible inferences in the light most favorable to the nonmoving party, with all well pleaded factual allegations in the nonmoving party's pleadings being taken as true and all contravening assertions in the movant's pleadings being taken as false." *Id.* "All allegations in the nonmovant's pleadings, except conclusions of law, legally impossible facts, and matters not admissible in evidence at the trial, are deemed admitted by the movant for purposes of the motion." *Ragsdale v. Kennedy*, 286 N.C. 130, 137 (1974).

23. "An exhibit, attached to and made a part of the pleading," *Wilson v. Crab Orchard Dev. Co.*, 276 N.C. 198, 206 (1970), and documents that are "the subject of the action and specifically referenced in the complaint," *Erie Ins. Exch. v. Builders Mut. Ins. Co.*, 227 N.C. App. 238, 242 (2013), are properly considered on a Rule 12(c) motion. Where a document is attached, "[t]he terms of such exhibit control other allegations of the pleading attempting to paraphrase or construe the exhibit, insofar as these are inconsistent with its terms." *Wilson*, 276 N.C. at 206.

24. "Subject matter jurisdiction is the indispensable foundation upon which valid judicial decisions rest," *In re T.R.P.*, 360 N.C. 588, 590 (2006), and "has been defined as 'the power to hear and to determine a legal controversy; to inquire into the facts, apply the law, and to render and enforce a judgment,' " *High v. Pearce*, 220 N.C. 266, 271 (1941) (citations omitted). "[T]he proceedings of a court without

jurisdiction of the subject matter are a nullity." *Burgess v. Gibbs*, 262 N.C. 462, 465 (1964) (citation omitted).

25. "As the party invoking jurisdiction, plaintiff has the burden of establishing standing." *Queen's Gap Cmty. Ass'n v. McNamee,* 2011 NCBC LEXIS 37, at *4 (N.C. Super. Ct. Sept. 23, 2011) (cleaned up). In determining the existence of subject matter jurisdiction, the Court may consider matters outside the pleadings. *Emory v. Jackson Chapel First Missionary Baptist Church*, 165 N.C. App. 489, 491 (2004) (citation omitted). "However, if the trial court confines its evaluation [of standing] to the pleadings, the court must accept as true the [claimant]'s allegations and construe them in the light most favorable to the [claimant]." *Munger v. State*, 202 N.C. App. 404, 410 (2010) (quoting *DOT v. Blue*, 147 N.C. App. 596, 603 (2001)).

## ANALYSIS

26. At the outset, it is important to emphasize what is (and is not) at issue with regard to Defendants' Motions.[6] The present Motions do not ask the Court to rule on the key legal issue in this lawsuit—that is, whether the April 2019 Transaction was legally invalid based on impermissible conflicts with the substantive provisions of the 1995 LP Agreement—or on the bulk of Woodcock's damages claims flowing from that question. Instead, Defendants' Motions raise limited issues that can collectively be divided into three categories. First, Defendants seek dismissal of all of Woodcock's *individual* claims as set out in the Complaint on the ground that he

---

[6] As noted above, the Court is addressing two discrete motions—each filed by a different set of Defendants. Nevertheless, due to the significant overlap between the arguments raised in the respective motions, the Court deems it appropriate to analyze them together.

lacks standing to assert them individually. Second, Defendants seek dismissal of Woodcock's fourth claim for relief— designated as an alternative derivative claim for breach of contract against CFVASC—on the ground that it fails to state a valid claim for relief. Finally, Defendants seek dismissal of Woodcock's sixth claim for relief, which is a claim for punitive damages. The Court will address each issue in turn.

## I. Standing

27. The bulk of Defendants' arguments concern the issue of standing. Defendants contend that because all of Woodcock's claims in this action are premised upon allegations of injury to FASC itself as a result of Defendants' actions, all of these claims must be brought derivatively. For this reason, Defendants seek judgment on the pleadings as to the *individual* claims Woodcock has asserted in Claims One, Two, Three, Five, Eight, and Eleven as set out in the Complaint.[7]

28. Our Court of Appeals has succinctly summarized the standing principles applicable to a suit involving limited partners in a partnership as follows:

> The general rule of partner standing to sue individually is stated in *Energy Investors*: "It is settled law in this State that one partner may not sue in his own name, and for his benefit, upon a cause of action in favor of a partnership." 351 N.C. at 336–37, 525 S.E.2d at 445 (citation and quotation marks omitted). The rule includes a cause of action against other partners in the partnership, *Jackson v. Marshall*, 140 N.C. App. 504, 508, 537 S.E.2d 232, 235 (2000), *disc. review denied*, 353 N.C. 375, 547 S.E.2d 10 (2001), as well as a cause of action against an unrelated third party, *Energy Investors*, 351 N.C. at 336–37, 525 S.E.2d at 445. "The only two exceptions to this rule are: (1) a plaintiff alleges an injury 'separate and distinct' to himself, or (2) the injuries arise out of a 'special duty' running from the alleged wrongdoer to the plaintiff."

---

[7] Each of these claims has been asserted *both* individually and derivatively, except for Claim Eleven (a claim for declaratory judgment) which appears to have been only brought individually. Defendants have not challenged Woodcock's standing to assert his derivative claims.

351 N.C. at 335, 525 S.E.2d at 444 (emphasis added) (recognizing the two exceptions in a suit brought by a limited partner and citing *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 660, 488 S.E.2d 215, 220 (1997), which recognized the same two exceptions in a suit brought by shareholders in a corporation).

*Gaskin v. J.S. Procter Co., LLC*, 196 N.C. App. 447, 451 (2009).

29.     An injury is "separate and distinct" when it is "peculiar or personal" to the plaintiff. *See Barger*, 346 N.C. at 659. "An injury is peculiar or personal to the [plaintiff] if 'a legal basis exists to support plaintiffs' allegations of an individual loss, separate and distinct from any damage suffered by the [entity.]' " *See id.* (quoting *Howell v. Fisher*, 49 N.C. App. 488, 492 (1980), *disc. rev. denied*, 302 N.C. 218 (1981)).

30.     To maintain an individual claim for injuries arising from a "special duty," a plaintiff "must allege facts from which it may be inferred that defendants owed plaintiffs a special duty. The special duty may arise from contract or otherwise." *Id.* Moreover, it is crucial that the "special duty" is "one that the alleged wrongdoer owed directly to the [plaintiff] as an individual." *Id.* Furthermore, the plaintiff must show "that defendants owed a duty to plaintiffs as [limited partners] and was separate and distinct from the duty defendants owed the [partnership]." *Id.*

31.     In sum, "[u]nless plaintiff, as a limited partner, alleged facts sufficient to fit into one of these two exceptions, his claims are derivative and he has no standing to bring this action as an individual, non-derivative claim." *Jackson v. Marshall*, 140 N.C. App. 504, 508 (2000).

32.     In the present case, Woodcock maintains that he possesses standing to assert the individual claims at issue because Defendants' acts in connection with the April 2019 Transaction violated his voting rights as a limited partner in FASC.

33. This Court has previously addressed the extent to which claims alleging a violation of a plaintiff's voting rights on company matters can be brought individually. *See Bennett v. Bennett*, 2019 NCBC LEXIS 19 (N.C. Super. Ct. Mar. 15, 2019); *759 Ventures, LLC v. GCP Apt. Investors, LLC*, 2018 NCBC LEXIS 82 (N.C. Super. Ct. Aug. 13, 2018).[8]

34. *759 Ventures* involved a management dispute between the two member-managers of an LLC. *759 Ventures*, 2018 NCBC LEXIS 82, at *1. The plaintiff owned a two-thirds membership interest in the company, and the defendant owned the remaining one-third. *Id.* at *2. The parties agreed to serve as co-managers with equal rights and authority to manage the LLC. *Id.* The plaintiff alleged that the defendant had breached the LLC's operating agreement by excluding the plaintiff from management decisions. *Id.* at *8. Specifically, the plaintiff contended that a distribution authorized by the defendant—without the plaintiff's approval—amounted to a deprivation "of its rights to participate equally in [the LLC's] management, to approve management decisions, and to veto distributions to [the LLC's] members." *Id.* at *9. In response, the defendant argued that the plaintiff lacked standing to bring a claim for breach of the operating agreement individually and that any such claim must be brought derivatively. *Id.* at *8.

35. This Court stated that "[t]he answer 'turns on whether the alleged injuries were caused directly to' [the plaintiff individually] or instead 'are a consequence of breaches of fiduciary duty that harmed' [the LLC]." *Id.* (quoting

---

[8] Although both *Bennett* and *759 Ventures* arose in the context of limited liability companies (LLCs), the standing principles discussed therein apply equally here.

Robinson on North Carolina Corporation Law § 34.04[5] (7th ed. 2017)). We concluded that the plaintiff had standing to pursue its individual claim for breach of the operating agreement because the

> alleged injuries are [plaintiff's] and [plaintiff's] alone. The right to exert management authority and the right to vote on key management decisions are rights possessed by [plaintiff], either as a manager of [the LLC] or as its majority member. The deprivation of those rights is a harm unique to [plaintiff], not one felt by [the LLC].

*Id*. at *9. The Court added that the plaintiff sought "to enforce its own rights under the Operating Agreement and to remedy its own injuries, not those of [the LLC]." *Id*. at *11. However, we noted that not "all claims asserted by a member or manager of an LLC for breach of its operating agreement are inherently [individual,]" and that "[t]o the extent the relevant term in an operating agreement gives rise to a duty owed to the company, a claim for breach of that duty is one belonging to the company, and not generally to its members or managers." *Id*. at *10–11.

36. In *Bennett,* the plaintiffs brought individual claims alleging that the defendants had breached fiduciary duties owed to them by seizing control of the LLC without the authorization of its members and then engaging in a series of acts to consolidate their control. *Bennett*, 2019 NCBC LEXIS 19, at *12. The defendants sought dismissal of the plaintiffs' individual claims on standing grounds. *Id*. This Court rejected the defendants' argument, ruling that the plaintiffs' alleged injuries were "separate and distinct" from those of the LLC. *Id*. at *14. We stated that "[a]t root [the plaintiffs] allege that [the defendants] seized managerial control without authorization and took actions on behalf of [the LLC] against the wishes of the

majority of its members. If so, the effect was to deprive dissenting members of their voting rights." *Id.*

37. Here, Woodcock's response to Defendants' standing argument is that the April 2019 Transaction violated his voting rights as a limited partner because the Contribution Agreement and the Equity Purchase Agreement could not lawfully have been executed under the terms of the 1995 LP Agreement without a prior vote of the limited partners authorizing these transactions. Based on the principles set forth in *759 Ventures* and *Bennett*, the Court must carefully review both the specific claims asserted by Woodcock at issue and the pertinent provisions of the 1995 LP Agreement in order to determine whether they do, in fact, sufficiently impact his voting rights so as to confer standing upon him to assert these claims individually. The Court deems it advisable to consider Claims One, Two, Three, and Five together as they all stem directly from the April 2019 Transaction. The Court will then separately address Claim Eight and then Claim Eleven.

**Claims One, Two, Three, and Five**

38. Claim One asserts a claim for breach of contract against CCHS and CFVASC. (Compl. ¶¶ 12–37.) Woodcock alleges that CCHS and CFVASC breached the 1995 LP Agreement by the act of entering into the Equity Purchase Agreement and the Contribution Agreement. (Compl. ¶ 13.)

39. In Claim Two, Woodcock asserts that through their participation in the April 2019 Transaction, SCA and NSC tortiously interfered with a contractual relationship—specifically, the contractual relationship established by the 1995 LP Agreement—by inducing CFVASC to violate that Agreement. (Compl. ¶¶ 38–54.)

40. Claim Three similarly alleges that CCHS tortiously interfered with a contractual relationship by virtue of its role in the April 2019 Transaction. (Compl. ¶¶ 55–62.)

41. Finally, in Claim Five, Woodcock alleges that NSC, SCA, and CCHS—through their roles in the April 2019 Transaction—engaged in a civil conspiracy by inducing CFVASC to violate its fiduciary and contractual duties. (Compl. ¶¶ 72–82.)

42. In opposing Defendants' standing arguments, Woodcock attempts to rely on two separate provisions of the 1995 LP Agreement—Sections 19.1 and 14.3—in order to show that his claimed injury stems from a denial of his voting rights so as to confer standing upon him to assert these claims not only derivatively but also individually.

43. Section 19.1 of the 1995 LP Agreement provides as follows:

*This Agreement may be modified or amended at any time by a writing signed by the General Partner and by Two-Thirds in Interest of the Limited Partners*; provided however, that, without the express, written consent of each Partner affected thereby, no such modification or amendment shall change the interest of any Partner in the capital, profits, losses or cash distributions of the Partnership or its rights of contribution or withdrawal with respect thereto.

(1995 LP Agreement, at p. 40 (emphasis added).)

44. Woodcock relies on the first clause of Section 19.1 in his standing argument. Although his Complaint is not a model of clarity, Woodcock does not appear to be alleging that the 1995 LP Agreement was *actually* amended or modified by the execution of the Contribution Agreement and Equity Purchase Agreement. Instead, his argument can be summarized as follows: (1) the terms of the Contribution Agreement and Equity Purchase Agreement conflict with various

substantive provisions of the 1995 LP Agreement; (2) for this reason, pursuant to Section 19.1, the Contribution Agreement and Equity Purchase Agreement could only be given legal effect if two-thirds of the limited partners had previously voted to amend the 1995 LP Agreement in a way that would permit the April 2019 Transaction to occur; and (3) by nevertheless executing these two documents without first obtaining a successful two-thirds vote and by proceeding to act as if they were legally effective, Defendants have deprived Woodcock of his right to vote on these issues.

45. The Court is unable to agree. Woodcock's argument, which is somewhat circular, is too attenuated to support his ultimate conclusion. As Defendants note, the acceptance of Woodcock's logic would mean that *any* violation of the 1995 LP Agreement could be construed as an infringement of his voting rights.

46. Woodcock's argument under Section 14.3 fails for an even more basic reason. The introductory paragraph to Section 14.3 provides as follows:

> In addition to other acts expressly prohibited or restricted by this Agreement or by the Partnership Act, and in order to eliminate or limit any actual or potential conflicts of interest between the General Partner and the Partnership or the Limited Partners, the General Partner shall have no authority to make any decision or take any action to act *on behalf of the Partnership* with respect to any of the following matters unless such decision or action within the scope of the following matters has been approved in writing by Two-Thirds in Interest of the Limited Partners[.]

(1995 LP Agreement, at p. 17 (emphasis added).) Section 14.3 then goes on to list 22 matters (separately enumerated as subparts (a)–(v)) that are prohibited. (1995 LP Agreement, at pp. 17–21.)

47. However, as quoted above, the opening paragraph of Section 14.3 expressly limits the scope of that section to actions taken by CFVASC—i.e., the General Partner—"*on behalf of the Partnership*[.]" (1995 LP Agreement, at p. 17 (emphasis added).)

48. The specific acts that Woodcock alleges in Claims One, Two, Three, and Five were taken "on behalf of" FASC are the execution of the Contribution Agreement and the Equity Purchase Agreement. However, because both of those documents are contained in the record, the Court does not have to rely on Woodcock's allegations concerning their contents. It is clear from the face of the Contribution Agreement and Equity Purchase Agreement themselves that FASC was *not* a party to those Agreements. Moreover, the signature pages show that NSC Fayetteville (as the General Partner was known at that time) signed the Agreements on its own behalf. There is simply no indication that NSC Fayetteville was intending to sign on behalf of the partnership itself.

49. Thus, Woodcock's reliance on Section 14.3 is misplaced. Accordingly, Claims One, Two, Three, and Five are DISMISSED without prejudice with regard to the *individual* claims contained therein.[9]

**Claim Eight**

50. The Court reaches a different conclusion with regard to whether Woodcock's individual claim contained in Claim Eight withstands Defendants' Rule 12(c) motion.

---

[9] The Court's ruling does not affect the *derivative* claims contained in Claims One, Two, Three, and Five, which remain viable.

51. Claim Eight consists of a tortious interference with contractual relationship claim against SCA. (Compl. ¶¶ 98–108.) However, unlike Claims One, Two, Three, and Five, Claim Eight is not based on the Contribution Agreement and the Equity Purchase Agreement.

52. Although the allegations set out in the Complaint in support of Claim Eight are not entirely free from ambiguity, this claim is premised on a document allegedly executed in 2008 entitled "Cash Management Agreement," which Woodcock contends was the device that SCA used to: (1) induce CFVASC to breach Section 10.1 of the 1995 LP Agreement (which relates to FASC's recordkeeping and bookkeeping policies); (2) cause CFVASC to commingle FASC funds with those of SCA and allow SCA to make unauthorized withdrawals of FASC funds; (3) induce CFVASC to ignore or violate its various contractual duties under Section 14.3 of the 1995 LP Agreement; and (4) cause CFVASC to ignore the rights of FASC's limited partners, including Woodcock's right to vote on any modification or amendment to the 1995 LP Agreement.

53. The Complaint asserts that "the 2008 Cash Management Agreement was signed by one SCA employee on behalf of SCA and signed by another SCA employee on behalf of the General Partner [(i.e., CFVASC)] *allegedly to bind FASC*[.]" (Compl. ¶ 101 (emphasis added).)

54. Unlike the Contribution Agreement and Equity Purchase Agreement, the Cash Management Agreement is not contained in the record presently before the Court. As such, the Court is bound by Plaintiff's allegations regarding the document as set out in the Complaint.

55. Giving Claim Eight its most charitable reading, it appears to allege that (1) the Cash Management Agreement was signed on behalf of CFVASC—as FASC's General Partner—in order to bind FASC itself, thereby implicating the initial paragraph of Section 14.3 of the 1995 LP Agreement; and (2) various provisions of the Cash Management Agreement violated one or more of the enumerated subparts of Section 14.3.

56. Out of an abundance of caution, the Court therefore concludes that Woodcock's allegations in Claim Eight are sufficient to confer standing upon him to assert this claim individually as well as derivatively.

57. Accordingly, Defendants' Motion is DENIED as to Claim Eight.

**Claim Eleven**

58. Finally, to the extent that Defendants are also seeking judgment on the pleadings as to Woodcock's individual claim seeking a declaratory judgment in Claim Eleven, the Court concludes that standing exists with regard to this claim.

59. In Claim Eleven, Woodcock seeks a declaration from the Court that the acts of the Defendants as alleged in the Complaint violated the 1995 LP Agreement.

60. In *Epic Chophouse, LLC v. Morasso*, 2019 NCBC LEXIS 55 (N.C. Super. Ct. Sep. 3, 2019), this Court addressed the issue of whether the plaintiffs, as parties to an LLC's operating agreement, could maintain an individual claim seeking a declaration as to the proper interpretation of the agreement. We held that such a claim was proper because "[b]y statute, parties to a contract have standing to seek this type of declaratory relief. *See* N.C.G.S. § 1-254. This right is personal to [the

LLC's members] and distinct from [the LLC's] own right, also as a party to the operating agreement, to seek declaratory relief." *Id.* at *13.

61. Therefore, to the extent that Defendants' Motions also seek judgment on the pleadings on standing grounds as to Woodcock's request individually for a declaratory judgment in Claim Eleven, the Motions are DENIED.

## II. Breach of Contract Against CFVASC (Fourth Claim for Relief)

62. In addition to the standing arguments contained in their Motions, Defendants also seek dismissal of Woodcock's derivative claim for breach of contract against CFVASC in Claim Four, which is premised on an alternative theory of liability.

63. However, the Court need not address Defendants' argument on this issue in any detail because at the 6 October 2022 hearing, counsel for Woodcock stated that he does not oppose this portion of Defendants' Motion.

64. Therefore, Claim Four in the Complaint is DISMISSED with prejudice.

## III. Punitive Damages (Sixth Claim for Relief)

65. The final issue raised in Defendants' Motions concerns Claim Six, which purports to state a separate claim for punitive damages against Defendants. Defendants seek dismissal of this claim because North Carolina does not recognize an independent cause of action for punitive damages.

66. Defendants are correct that "punitive damages are a remedy rather than a standalone cause of action." *Halikierra Cmty. Servs. LLC v. N.C. HHS*, 2021 NCBC LEXIS 27, at *25 (N.C. Super. Ct. Mar. 25, 2021); *see also Collier v. Bryant*, 165 N.C.

App. 419, 434 (2011) ("Punitive damages are available, not as an individual cause of action, but as incidental damages to a cause of action.").

67. Therefore, Claim Six is DISMISSED without prejudice to Woodcock's right to seek punitive damages as a remedy for its remaining claims to the extent such damages are otherwise recoverable under North Carolina law. *Halikierra*, 2021 NCBC LEXIS 27, at \*25.

## CONCLUSION

**THEREFORE, IT IS ORDERED** as follows:

1. Defendants CCHS and CFVASC's Motion for Judgment on the Pleadings as to the *individual* claims contained within Claims One, Three, and Five in the Complaint is **GRANTED**, and these claims are **DISMISSED** without prejudice.

2. Defendant CFVASC's Motion for Judgment on the Pleadings as to Claim Four of the Complaint is **GRANTED**, and this claim is **DISMISSED** with prejudice.

3. Defendants CCHS and CFVASC's Motion for Judgment on the Pleadings as to the *individual* claim contained within Claim Eleven in the Complaint is **DENIED**.

4. Defendants SCA and NSC's Motion for Judgment on the Pleadings as to the *individual* claim contained within Claim Two in the Complaint is **GRANTED**, and this claim is **DISMISSED** without prejudice.

5. Defendant SCA's Motion for Judgment on the Pleadings as to the *individual* claim contained within Claim Eight in the Complaint is **DENIED**.

6. Defendants' NSC and SCA's Motion for Judgment on the Pleadings as to Claim Six in the Complaint is **GRANTED** without prejudice to Plaintiff's right to seek punitive damages as a remedy for his surviving claims to the extent permitted by law.

SO ORDERED, this the 7th day of November, 2022.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge for
Complex Business Cases